CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

FEB 2 8 2022

JULIA C. DUDLEY, CLERK
BY: ~~Beeson~~
DEPUTY CLERK

**Keith Hallacher**

631 Campbell Ave SE  Apt 205

Roanoke, VA  24013

Cell- 540-904-3024

7: 22CV 108

## COMPLAINT

1. In or around January of 2015, Keith Hallacher (hereafter "Complainant"), residing at 631 Campbell Ave SE  Apt 205 Roanoke, VA  24013, entered discussions with Allstate representatives to become an Exclusive Agent to sell Respondent's services.

2. In or around January of 2015, Complainant traveled from Virginia to Chicago, Illinois to attend a ten-day corporate training session.  The validation were re-affirmed and were consistent across the country.

3. In or around February of 2015, Complainant attended a three-week training session in Chantilly, Virginia.  Much of the training consisted of assistance in reaching the agency validation requirements.

4. In or around May of 2015, in reliance on Respondent's promise to retain Complainant as an Exclusive Agent, Complainant opened a new agency to sell Respondent's products and services.

5. In or around May of 2015, Complainant entered into a lease for a period of 5 years for office space at 2302 Colonial Ave Suite C Roanoke, VA 24015.

6. In or around February of 2016, in reliance on Respondent's promise to retain Complainant as an Exclusive Agent, Complainant purchased a book of business from Allegheny Motors in Covington, Virginia for approximately $17,000.

7. In or around March of 2017, in reliance on Respondent's promise to retain Complainant as an Exclusive Agent, Complainant purchased a book of business from Sam Benson in Roanoke, Virginia for approximately $87,000.

8. In or around January of 2018, Fred Miller becomes Field Sales Leader that Complainant reports to and Mr. Miller contacts Complainant alleging that Complainant was not meeting a sales target that was not part of Complainant's validation targets.

9. From January of 2018 to September 2018, Mr. Miller continuously harassed Complainant with allegations that Complainant was not meeting sales targets, Complainant denied these allegations and felt targeted by Mr. Miller.

10. On September 10 of 2018, Complainant sent an email complaint to Robert Becker, a Vice-President and representative of Respondent, and Jennifer Yingling, a Territory Sales Leader and representative of Respondant, detailing Mr. Miller's targeting of Complainant.

11. On September 11 of 2018, Ms. Yingling telephoned Complainant and promised Complainant that Mr. Miller could not close Complainant's agency because Complainant had met all of his specific validation requirements.

12. On September 14 of 2018, Mr. Becker called Complainant and stressed his committment to the succes of his agents. Both these phone calls were legally recorded and can be made available upon request.

13. In or around March of 2019, Respondent introduced a new business objective that was required to be met or the Complainant's agency would be closed, this new business objective was to sell new automotive insurance policies was not part of the validation requirements.

14. In or around March of 2019, Respondent raised the rates on automotive insurance policies making it more difficult to sell new automotive insurance policies and to meet the new business objective.

15. In or around May of 2020, Respondent sent a letter, signed by Ms. Yingling, to Complainant informing him that Respondent was closing Complainant's insurance agency. The book of business was seized and retained by Allstate, and was transfered to the Bill Richards agency in Salem, VA at a reduced commission of 3.5% rather that the 9% payed to the Complainant. Bill Richards was not granted possession of Complainant book of business, he was just paid the 3.5% to service the business. Allstate fradulantly took possession of the business they legally arranged to for Complainant to purchase.

16. During purchase negotiations, Allstate representatives portrayed it as a franchise, but they explained they could not legally call it a franchise. They also explained that due to the nature of the heavily regulated insurance industry, they were contracturally required to leave the option open to close an agency for any reason. However, an agent had two years to reach various validation requirements. Once these were acheived the agency would not be closed as long as all Allstate legal requirements were met. If the validation requirements were not met then the agency would be closed. The validation requirements from Allstate were made fraudulently with the intent to deceive potential agents into believing they had protections that did not truly exist. If they intended to honor their validation agreements, they would have included them in the contract, and the agency would not have been closed.

17. Allstate is not a franchise, but if you Google Allstate Franchises you get about 665,000 results. They are happy to let the perception exist that they are a franchise, but they are not, and there are legal differences. According to https://brandongaille.com/, you might get to own equity in your own business as an Allstate agency owner, but it is a brand relationship which is closer to an employer-employee model. You are asked to "pay to play," then become subject to the mercies of the people who oversee your presence. The sale af any agency must be approved by Allstate.

18. According to https://www.upcounsel.com/, the four corners rule contract law, stipulates that if two parties enter into a written agreement, they cannot use oral or implied agreements in court to contradict the terms of the written agreement. There are only a few instances when outside evidence is permissible for supporting a written contract. One instance is when one party committed fraud, interference, unconscionable behavior, or was under duress when creating the contract. The original contract is invalid because Allstate fradulently offered protections with the validation requirements which did not exist.

19. In or around June of 2020, Respondent informed Complainant that he would be reimbursed $4748.21 per month for a period of 24 months, resulting in a total of $113,957.04.

20. Complainant has spent approximately $150,000 to start, maintain, and grow the insurance agency, accordingly Respondent's offer of $113,957.04 merely compensates Complainant for expenses that were previously incurred and paid for by Complainant.

21.  Complainant was earning approximately $120,000 per year at the time the agency was closed, the yearly earnings were growing at a rate of approximately five percent per year and Complainant was expecting to run the agency for at least another twenty years.

22.  Complainant has lost approximately $3,500,000 in future earnings as a result of Respondent's malfeasance in closing Complainant's insurance agency even thought Complainant continuously met the validation target requirements.

23.  Complainant has suffered further hardship form having his insurance agency closed and has endured expenses in closing Respondent's offices.

24.  This court has personal jurisdiction over Respondent because Respondent operates businesses within this jurisdiction.

25.  As such, Complainant is seeking a reward of $4,500,000 to compensate for expenses, lost future wages, and punitive damages.

Complainant reserves the right to amend this Complaint in the event discovery of other information as appropriate.

Respectfully Yours,

Keith Hallacher,  Complainant

2/28/22